UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**Case Number: 21-21555-CIV-MARTINEZ-BECERRA**

PINNACLE FOODS OF CALIFORNIA, LLC,

      Plaintiff,

v.

POPEYES LOUISIANA KITCHEN, INC.;
RESTAURANT BRANDS INTERNATIONAL,
INC.; and DOES 1 through 10,

      Defendants.

_____/

**OMNIBUS ORDER**

**THIS CAUSE** came before the Court on (I) Defendant Popeyes Louisiana Kitchen, Inc. ("Popeyes" or "Franchisor")'s Motion to Dismiss the Second Amended Complaint ("Popeyes' Motion to Dismiss" or "PMTD") (ECF No. 80); (II) Plaintiff Pinnacle Foods of California, LLC ("Plaintiff" or "Developer")'s Motion for Leave to File Third Amended and Supplemental Complaint ("Motion to Amend" or "MTA") (ECF No. 103); and (III) Defendant Restaurant Brands International, Inc. ("RBI")'s Motion to Quash Service of Process or, in the Alternative, Motion to Dismiss Plaintiff's Second Amended Complaint ("RBI's Motion to Dismiss" or "RMTD") (ECF No. 88).  After careful consideration, the Court rules as follows.

**I.    POPEYES' MOTION TO DISMISS**

Popeyes has moved to dismiss the Second Amendment Complaint.  (PMTD, ECF No. 80). Plaintiff has responded in opposition to the Motion to Dismiss, and Popeyes has replied in support of its Motion.  (Resp. to PMTD, ECF No. 92; Reply to PMTD, ECF No. 102).  After careful

1

consideration, the Court **GRANTS IN PART AND DENIES IN PART** Popeyes' Motion to Dismiss.

## 1. <u>Background</u>

Popeyes is the franchisor of a multinational chain of fast-food restaurants operating under the POPEYES® brand ("Popeyes Restaurants").  (SAC ¶ 1, ECF No. 79).   Popeyes Restaurants specialize in the preparation, merchandising, advertising, and sale of "Louisiana"-style menu items, including spicy chicken, biscuits, fried shrimp and other seafood, red beans and rice, and other quick-service items developed and owned by Popeyes.  (*See* Development Agreement ("D.A.") at 1, ECF No. 79-1).  Popeyes is owned and controlled by its indirect corporate parent, RBI.  (SAC ¶ 1).  Plaintiff is a Popeyes franchisee owned by Imran Damani.  (*Id.* ¶ 2).

In May 2018, Damani opened his first Popeyes Restaurant in San Diego, California.  (SAC ¶ 2).  During the fall of that year, the parties discussed expanding Damani's operations by (1) purchasing, rehabilitating, and operating five Popeyes Restaurants in Fresno, California ("Fresno Restaurants"), and five Popeyes Restaurants in Bakersfield, California and (2) signing a development agreement providing Damani with the opportunity to develop and operate ten additional Popeyes Restaurants in central California.  (SAC ¶ 20).

### i. <u>2018 Asset Purchase Agreement</u>

On September 27, 2018, Pinnacle signed a Letter of Intent to purchase the five Fresno Restaurants.  (SAC ¶ 33).  Concerned about the poor condition of the Fresno Restaurants, Damani asked Popeyes: "[W]ill RBI conduct a walk through on the stores and require seller to make necessary changes/repairs before the transaction is complete?"  (Oct. 30–31, 2018, Fresno E-mail Exchange ("October 2018 Fresno E-mails"), ECF No. 79-1 at 31).  A Popeyes representative responded: "We call this necessary changes/repairs scope of work (SOW).  After receiving the

Asset and Purchase Agreement from you I will send a Construction Manager to the store to make an assessment and provide us the SOW." (*Id.*).

Plaintiff alleges that, in reliance on this promise, it signed the Asset Purchase Agreement on November 27, 2018, where Plaintiff agreed to purchase the five Fresno Restaurants. (SAC ¶ 34). Plaintiff alleges that Popeyes neither conducted the walk-through nor informed Plaintiff of its failure to do so. (*Id.* ¶ 35). When Plaintiff began operating the Fresno Restaurants in March 2019, it allegedly discovered that the condition of the Restaurants was significantly worse than had been represented by the seller and Popeyes. (*Id.* ¶ 37). In fact, Popeyes shut down two of the Fresno Restaurants for emergency repairs and maintenance. (*Id.*). The other three Fresno Restaurants also had problems; one had been shut down by the local health department due to equipment that did not comply with state codes, ceiling leaks, and pest issues. (*Id.*). Due to these problems, Plaintiff alleges that bringing the Fresno Restaurants' facilitates and operations up to Popeyes' standards required a significantly higher investment and longer period of time than Popeyes represented. (*Id.* ¶¶ 38–39).

In addition, as part of the Asset and Purchase Agreement, Plaintiff was required to purchase a new point-of-sale ("POS") system from NCR—a vendor selected by Popeyes—and implement that POS system at all of the Fresno Restaurants. (SAC ¶ 40). Plaintiff alleges the POS system experienced chronic, repeated, and unpredictable outages, sometimes lasting several hours, which prevented Plaintiff from accepting orders from customers. (*Id.* ¶ 41). In addition, the POS system did not always process orders. (*Id.*).

These POS outages caused customer dissatisfaction and complaints. (SAC ¶ 41). Throughout 2019 and 2020, Plaintiff alleges that it promptly notified Popeyes about the outages and resulting customer complaints, but the source of the problem was never identified or definitively corrected. (*Id.* ¶ 42). For example, Plaintiff attaches to the Second Amended

Complaint[1] an e-mail exchange from June 2020 where Damani communicated to an RBI representative about the POS outages and requested assistance.  (June 2020, "New issues store 12070" E-mail Exchange, ECF No. 79-1 at 34–39).  The RBI representative responded to Damani that he had escalated the issue with NCR but that he did not see how the POS outages caused operations issues.  (*Id.* at 36).  Damani responded to the e-mail in disagreement, stating that the outages and crashes were causing customer dissatisfaction.  (*Id.* at 34).  He attached a customer complaint: "Overall Satisfaction: Dissatisfied," explaining, "Took forever.  The system crashed, tried making me get off the car [sic] go inside and re take my order so they could charge me at the front counter.  I said no.  Take my card and charge me at the front counter I am not getting off my car [sic].  They need to be able to handle the situation under pressure."  (*Id.* at 35).

    ii.    **<u>2019 Development Agreement</u>**

On February 21, 2019, Popeyes and Pinnacle entered into a Development Agreement where Plaintiff agreed to develop and operate Popeyes Restaurants in a designated development area pursuant to a development schedule ("Franchised Units") in exchange for the payment of Franchise Fees.  (*See* SAC ¶ 4; *see also* D.A. at 2).

**A. Development Schedule**

Pursuant to the development schedule, the parties agreed to the cumulative net amount of franchises Plaintiff would open ("Development Schedule").  (D.A. at Ex. A).  Plaintiff agreed to open 2 restaurants by 2020, 4 restaurants by 2021, 7 restaurants by 2022, and 10 restaurants by 2023 ("Cumulative Net Opening Target").  (*Id.*).

---

[1]    "A district court can generally consider exhibits attached to a complaint in ruling on a motion to dismiss, and if the allegations of the complaint about a particular exhibit conflict with the contents of the exhibit itself, the exhibit controls." *Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016).

### B.  Development Area & Exclusivity Provision

The Development Agreement provided that each Franchised Unit must be located in the designated development area ("Development Area").  (D.A. § 1.01).   The Development Area consisted of the counties of Fresno, Kings, Madera, Mariposa, Merced, and Tulare within the Fresno Designated Market Area, as defined by Nielsen Media Research, Inc. ("DMA") and the county of Kern, located within the Bakersfield DMA.  (D.A. at Ex. B; *see also* D.A. § 3.01(A) (defining DMA)).

As part of the Development Agreement, Popeyes agreed that it would "neither establish nor license anyone other than Developer to establish a Franchised Unit in the Development Area during the Development Term" (the "Exclusivity Provision").  (D.A. at § 1.02).

### C.  Franchise Unit Openings

In order to develop a Franchise Unit, Plaintiff was required first to submit a complete site request package for Popeyes to review.  (D.A. § 4.01).  Within 45 days of receipt of the site request package, Popeyes was required to "evaluate each site, proposed site plan, floor plan, and elections" and to send Plaintiff "written notice of acceptance or non-acceptance of the site plans and evaluations."  (*Id.*).  Notice from Popeyes could be delayed by 30 or 40 additional days.  (*Id.*).

Under the Development Agreement, Popeyes could "refuse to accept any site for a proposed Franchised Unit for any reason, in the Franchisor's sole judgment applying standards consistent with criteria Franchisor uses to approve sites in other comparable market areas, including Developer's failure to demonstrate sufficient financial capacities to properly develop, operate and maintain the proposed Franchised Unit."  (*Id.*).

### D.  Franchise Fees

In exchange for the right to develop Franchise Units, Plaintiff agreed to pay franchise fees to Popeyes in an "aggregate amount equal to $50,000 *multiplied by* the Net Opening Target for the

Year in question (each, a 'Franchise Fee Prepayment')." (D.A. § 2.01) (emphasis in original).  The Franchise Fee Prepayment would "serve as a credit towards the Franchise Fee of $50,000 due from Developer to Franchisor under the Franchise Agreement for the opening of each Franchised Unit for the applicable Year." (D.A. § 2.01(A)).  Popeyes would "apply $50,000 from the previously made Franchise Fee Prepayment as payment for the Franchise Fee owed by the Developer for the applicable Franchised Unit until the full amount of the Franchise Fee Prepayment [was] applied." (D.A. § 1.01(A)).

### E.  Default

Popeyes could declare Plaintiff to be in default of the Development Agreement if Plaintiff's "operations fail[ed] at any time to score in the top fifty percent (50%) of the Peer Category . . . in which Franchisor placed Developer for each of Franchisor's then-standard metrics as applied consistently across the Popeyes brand domestically." (D.A. §5.03(B)).  Peer Category was defined as "each category of similarly situated Popeyes franchisees that Franchisor may designate from time to time in its discretion." (D.A. §5.03(B)(1)).

Popeyes typically established Peer Categories based on the number of Popeyes Restaurants operated by a franchisee or its affiliates.  (SAC ¶ 29).  For example, franchisees that operated between one and five Popeyes Restaurants would be a Peer Category, and franchisees operating between six and fourteen Popeyes Restaurants would be another Peer Category.  (*Id.*; *see also* May 18, 2022 "Operations Update" E-mail, ECF No. 79-1 at 41; Aug. 3, 2020 "Operations Update" E-mail, ECF No. 79-1 at 48).  The "then-standard metrics" from which Popeyes allegedly evaluated franchisees' performance were Overall Satisfaction ("OSAT") scores.  (SAC ¶ 30).  Some of the factors impacting OSAT Scores are speed of service and customer satisfaction.  (*Id.*; *see also* VOG Complaint Identification Worksheet, ECF No. 79-1 at 47).

The Development Agreement further provided that Plaintiff would be in default if it "fail[ed] to comply with the Development Schedule," (D.A. § 5.03(C)), or "fail[ed] to obtain Franchisor's acceptance of a site or approval of construction plans," (D.A. § 5.03(D)).

If Plaintiff defaulted under the Development Agreement, Popeyes was entitled to terminate the Agreement "without affording Developer any opportunity to cure the default." (D.A. § 5.03(E)(1)). Popeyes was also entitled to "[t]erminate the territorial exclusivity granted Developer in Section 1.01 hereof or reduce the area of territorial exclusivity granted Developer hereunder," effective immediately upon mailing of any notice of default. (D.A. § 5.03(E)(3)).

### F. Limitation of Liability

The Development Agreement limited the ability for Plaintiff and Popeyes to recover damages in the event of a breach. (*See* D.A. § 15.07). Specifically, the agreement provided the parties "waive[d] to the fullest extent permitted by law any right to or claim of any consequential, punitive, or exemplary damages against the other, and agree[d] that in the event of a dispute between them each shall be limited to the recovery of any actual damages sustained by it" ("Limitation of Liability Provision"). (*Id.*).

### iii. <u>Turlock Site & Proposed Sites for Development</u>

Between August and September 2019, Plaintiff and Popeyes allegedly discussed a potential site located in Turlock, California for the first restaurant to be developed and operated by Plaintiff under the Development Agreement ("Turlock Site"). (SAC ¶ 46). Although the Turlock Site was outside the Development Area, Popeyes approved the site location and agreed to count it towards the two locations that Plaintiff was required to develop in 2020. (*Id.*). Plaintiff alleges that Popeyes agreed to allow Plaintiff to develop and operate the Turlock Site "to make up for Popeyes' admitted failure to inform Pinnacle about a site under development in the Development Agreement's exclusive territory." (*Id.*). Plaintiff moved forward with developing and opening the

Turlock Site.  (*Id.* ¶¶ 46–47).  During the same time, Plaintiff worked with RBI representative Vanilla McIntosh to identify additional sites for development.  (*Id.* ¶ 47).  By early 2020, the parties had identified and negotiated three additional sites.  (*Id.*).

iv.     **RBI's Alleged Marketing Strategy**

After signing the Development Agreement, Plaintiff alleges that RBI "developed an overall marketing strategy" that was incompatible with the Exclusivity Provision contained in the Development Agreement.  (SAC ¶¶ 48–50).  RBI allegedly instructed Popeyes to terminate the Development Agreement, or at least the Exclusivity Provision.  (*Id.* ¶ 49).  Plaintiff contends that in January 2020, Popeyes informed Plaintiff that it wanted to "cancel" the Development Agreement and that Popeyes would not allow Plaintiff to submit any sites for development.  (*Id.* ¶ 50).  About a month later, Popeyes' representative Vinicius Diniz sent Plaintiff and Damani a draft mutual termination agreement, under which Plaintiff would give up all of its rights under the Development Agreement ("Mutual Termination Agreement").  (*Id.* ¶ 52; *see also* Draft Agreement of Cancellation and Termination of Development Agreement and General Release, ECF No. 79-1 at 52).

Plaintiff declined to sign the Mutual Termination Agreement and attempted to persuade Popeyes to drop its demand.  (SAC ¶ 53).  Changing course, in April 2020, Diniz informed Plaintiff via telephone conversation that Plaintiff would be permitted to submit site packages under the Development Agreement.  (*Id.* ¶ 54).  The next day, Damani sent Diniz an e-mail recapping their conversation.  (April 28, 2020 "call recap 4/27," ECF No. 79-1 at 86).  The recap e-mail stated that, in accordance with their conversation, Damani had "submitted two sites that [he] [was] ready to move forward on," and had "additional sites in the pipeline if either of th[ose] sites [was] an issue."  (*Id.*).

Despite submitting several site packages for approval, Plaintiff alleges that Popeyes refused to consider them in good faith.  (SAC ¶ 56).  For example, one of three site packages Plaintiff submitted to Popeyes for approval—following the telephone conversation with Diniz—was located in Fresno, California ("Fresno Site").  (*Id.* ¶ 57).  Plaintiff alleges that this Fresno Site had already been approved for development by another franchisee, but the deal had fallen through. (*Id.*).  The Fresno Site allegedly satisfied Popeyes' site selection requirements in that it was highly visible, on the preferred side of the road, and near a major freeway exit.  (*Id.*).

On June 19, 2020, Popeyes declined Plaintiff's site package for the Fresno Site because "the real estate [did] not meet the standards for [Popeyes'] development in the market."  (June 19, 2020, Letter re: Proposed Fresno Site, ECF No. 79-2 at 2).  A few days later, Damani responded, asking for additional information as to why the site was rejected to "help [him] avoid wasting money when assessing future growth opportunities."  (June 23, 2020, Response Letter re: Fresno Site, ECF No. 79-2 at 4).

> **v.      June 2020 Notice of Default Based on Low OSAT Scores**

The day after Damani responded to Popeyes' Letter rejecting the site approval package for the Fresno Site, Popeyes sent Plaintiff a written Notice of Default ("Default Letter").  (June 24, 2020, Notice of Default, ECF No. 79-2 at 6–7). The Default Letter stated that Plaintiff "was in default under the terms and conditions of **Section 5.03** of the Development Agreement for failing to operate Developer's existing Popeyes restaurants in a manner which would rank its operations in the top 50% of the Peer Category[.]"  (*Id.* at 6) (emphasis in original).

An exhibit attached to the Default Letter showed Imran Damani's portfolio ranked below a 50% average OSAT Score for the months of January through May 2020: 11.90% in January; 11.90% in January; 40.40% in March; 48.90% in April; and 46.20% in May.  (ECF No. 79-2 at 8). As a result of this default, the Default Letter advised that "effective immediately Developer no

longer ha[d] territorial exclusivity granted in **Section 1.01** under the terms and conditions of **Section 5.03E3** of the Development Agreement." (*Id.* at 6) (emphasis in original).

The Default Letter stated that if Plaintiff did not cure its default within sixty days of receipt of the Letter by improving its OSAT Score to rank within the top 50% of its Peer Category, and not thereafter ranking below the top 50%, Popeyes could elect "in its sole discretion, to terminate the Development Agreement at any time after ninety (90) days" from Plaintiff's receipt of the Default Letter. (*Id.* at 6–7).

By July 2020—within the cure period—Damani's Popeyes portfolio reached a 65.8% OSAT Score ranking. (Aug. 3, 2020 "Operations Update," ECF No. 79-1 at 48). Plaintiff alleges that it has continued to earn "top-tier OSAT scores since July 2020, and—based on available data—Pinnacle is within the top 15 of over 60 franchisees in its Peer Category." (SAC ¶ 92). Despite Plaintiff's cure of the default, on December 22, 2020, Popeyes' attorney e-mailed Plaintiff's attorney stating that Popeyes "cannot allow this to continue to drag on" and that if "we do not receive an executed copy of the [Mutual Termination Agreement] this week, we will be left with no choice but to send a termination notice." (Dec. 22, 2020, "Notice of Default dated June 24, 2020" E-mail, ECF No. 79-2 at 37; *see also* SAC ¶¶ 74–75).

vi.      **The Expansion Policy and Filing of This Action**

By the end of December 2020, Plaintiff initiated this action against Popeyes and John Does 1 through 10 in California state court. (ECF No. 1-1). Plaintiff alleges that after it initiated suit, Popeyes "move[d] the goalposts" by finding Plaintiff in default for reasons other than those articulated in the Default Letter. (SAC ¶ 83). In January 2021, Popeyes' attorney sent Plaintiff a letter ("January GJB Letter") stating that Plaintiff "has failed to comply with its most fundamental obligations under its Development Agreement, including its failure to meet the requisite Development Schedule, its failure to timely pay the Franchise Fee Prepayment for 2020, its failures

10

to make the $100,000 Franchise Fee Prepayment due at the beginning of this year, and its failure to meet the operational standards of the Popeyes system." (Jan. 27, 2021, Genovese, Joblove & Battista Letter, ECF No. 79-2 at 39).

The January GJB Letter further noted that Popeyes remained "willing to discuss the possibility of sustaining some form of a business relationship between the parties" if they could sort out "a couple of fundamental business issues." (*Id.* at 41). Those issues included Plaintiff paying the 2021 Franchise Fee Prepayment, the parties reaching an agreement on how Plaintiff "intends to operate by year end the requisite number of four new units due under the Development Schedule," and Plaintiff taking "the requisite steps necessary to become approved for new locations in accordance with the Popeyes Expansion Policy." (*Id.*). Popeyes informed Plaintiff that it was "disqualified" from obtaining (1) Credit Approval under the Expansion Policy because it did not pay the 2021 Franchise Fee Prepayment, (2) Legal Approval under the Expansion Policy because of its "current breaches under the Development Agreement," and (3) Operations Approval under the Expansion Policy because Plaintiff's "average scores as measured based upon six month averages do not place its operations in the top 50% of operational scores among Popeyes restaurants in North America" ("OPS Score") (*Id.*). The January GJB Letter explained that the OPS Score is "separate from the OSAT score issue which was the subject of the default," and which Plaintiff had concededly cured. (*Id.*). Because Plaintiff cured the OSAT Score default, Popeyes noted that Plaintiff still had "a valid Development Agreement in place, subject only to the termination of territorial exclusivity which occurred at the time of its default." (*Id.*).

Plaintiff's attorney responded to the January GLB Letter stating, among other things, that the Expansion Policy was not applicable to the Development Agreement. (Feb. 4, 2021, Mulcahy LP Letter, ECF No. 79-2 at 44). As for its late payment of the 2021 Franchise Fee Prepayment, Plaintiff alleges that the delay was "Popeyes' fault: Popeyes was entitled to withdraw the fees

directly from Pinnacle's bank account without any action by Pinnacle, and in fact Popeyes eventually did withdraw them." (SAC ¶ 79). In addition, Plaintiff alleges that its failure to open restaurants in compliance with the Development Schedule "was the direct (and predictable) result of Popeyes' refusal to consider the multiple site packages that Pinnacle submitted for review." (*Id.*). Plaintiff informed Popeyes that its failure to approve Plaintiff's proposed sites was blocking Plaintiff's ability to develop. (ECF No. 79-2 at 44). For example, a landlord informed Plaintiff that due to the extended length of time taken to obtain corporate approval of a site, the landlord had lost faith in Plaintiff's ability to perform and had sought out other tenants to replace the Popeyes Restaurant. (*Id.* at 44–45, 49). As for Plaintiff's purported failure to keep up with the Development Schedule, Plaintiff noted that Popeyes agreed to count the Turlock Site as the first location under the Development Agreement. (*Id.*).

Popeyes' attorney responded ("March GJB Letter"), stating that the Expansion Policy was included within Section 4.01 of the Development Agreement, which provides that Popeyes may "refuse to accept a site for the proposed development of a POPEYES® restaurant for any reason, in [Popeyes'] sole judgment applying standards consistent with criteria [Popeyes] uses to approve sites in other comparable markets." (Mar. 3, 2021, Genovese, Joblove & Battista Letter, ECF No. 79-2 at 71). In other words, the Expansion Policy was part of the "criteria" in which Popeyes used to approve sites. (*Id.*). The March GLB Letter reiterated that Plaintiff did not qualify for Credit Approval based on its failure to timely pay the 2020 and 2021 Franchise Fee Prepayments. (*Id.* at 72). It also stated that Popeyes agreed to count the Turlock Site as a new unit under the Development Schedule, but that Plaintiff was still one Franchised Unit short of its development obligations for 2020. (*Id.* at 73).

### vii.    Second Amended Complaint & Popeyes' Motion to Dismiss

Since initiating this action in December 2020, Plaintiff has amended its complaint twice.

The operative Second Amended Complaint is pled against Defendants Popeyes, RBI, and John

Does 1 through 10.  It asserts six claims:

(1) **Breach of Contract**, against Popeyes;

(2) **Breach of Implied Covenant of Good Faith and Fair Dealing – Failure to Review and Approve Sites**, against Popeyes;

(3) **Breach of the Implied Covenant of Good Faith and Fair Dealing – Termination of Exclusive Territory**, against Popeyes;

(4) **Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**, against Popeyes and RBI;

(5) **Tortious Interference with Contractual Relationship**, against RBI;

(6) **Tortious Interference with Business Relationship**, against RBI;

(SAC ¶¶ 94–145).  Popeyes moves to dismiss (i) the Second Amended Complaint as a shotgun

pleading,[2] (ii) the FDUPTA claim (Count 4) because Plaintiff did not suffer actual damages and

because Plaintiff's allegations rely solely on breach of contract, (iii) the breach of contract (Count

1) and implied covenant claims (Counts 2 and 3) because Plaintiff has not alleged recoverable

damages, (iv) the implied covenant claim claims (Counts 2 and 3) for failure to state a claim, and

(v) the request for a mandatory injunction because this form of relief is unavailable under Florida

law.  (PMTD at 6–18, ECF No. 80).  Popeyes' Motion to Dismiss is now ripe for review.

### 2.    Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), the Court will grant a motion to dismiss

if the complaint fails to state a claim for which relief can be granted.  To survive dismissal, the

complaint must provide "a short and plain statement of the claim showing that the pleader is

---

[2]    The Court will address this issue in Section (II) of this Order, which contains the Court's ruling on Plaintiff's Motion to Amend, (ECF No. 103).

entitled to relief." Fed. R. Civ. P. 8(a)(2). At this stage of the case, "the question is whether the complaint 'contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Worthy v. Phenix City*, 930 F.3d 1206, 1217 (11th Cir. 2019) (alteration adopted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In ruling on a motion to dismiss, the Court construes the allegations "in the light most favorable to plaintiff." *Speaker v. U.S. HHS CDC & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010).

### 3. <u>Discussion</u>

### i. <u>Breach of Contract (Count 1)</u>

Plaintiff alleges that Popeyes breached Section 1.01 and 4.01 of Development Agreement by failing to consider Plaintiff's proposed site packages under the same criteria Popeyes uses to evaluate other sites in comparable markets. (SAC ¶¶ 94–102). Popeyes argues that the breach of contract claim must be dismissed because Plaintiff does not allege any actual damages, which are the only damages Plaintiff can allegedly recover under the Development Agreement. (PMTD at 11–12). As Plaintiff points out in its Response to Popeyes' Motion to Dismiss, the Complaint alleges that Plaintiff seeks to recover "compensatory" damages from Popeyes' purported breach of contract. (Resp. to PMTD at 5; *see also* SAC at 21). Under Florida law, which governs here,[3] "compensatory" damages are synonymous with "actual" damages. *See Lassiter v. Int't Union of Operating Engineers*, 349 So. 2d 622, 625 (Fla. 1976) ("The terms compensatory and actual damages have been used interchangeably by the courts in dealing with the problem at hand."); *Ross v. Gore*, 48 So. 2d 412, 414 (Fla. 1950) (noting that "it is fair to assume that 'actual damages' mean 'compensatory damages'"). Moreover, the factual allegations support a plausible claim for

---

[3]     In cases brought on the basis of diversity jurisdiction, like this one, (SAC ¶ 15), state law applies to any issue not governed by the Constitution or treaties of the United States or Acts of Congress. 28 U.S.C. § 1652.

actual damages.  (*See* SAC ¶ 63; *see also* ECF No. 79-2 at 44–45, 49).  Accordingly, the Court declines to dismiss Plaintiff's breach of contract claim for failure to allege recoverable damages.

### ii.    <u>Implied Covenant of Good Faith and Fair Dealing (Counts 2 & 3)</u>

Plaintiff alleges that Popeyes breached the implied covenant of good faith and fair dealing by failing to consider Plaintiff's proposed site packages under the same criteria Popeyes uses to evaluate other sites in comparable markets (Count 2), and by terminating the Exclusivity Provision for pretextual reasons (Count 3).  "Under Florida law, the covenant of good faith and fair dealing is implied in every contract, requiring the parties to follow standards of good faith and fair dealing designed to protect the parties' reasonable contractual expectations."  *Townhouses of Highland Beach Condo. Ass'n v. QBE Ins. Corp.*, 504 F. Supp. 2d 1307, 1310 (S.D. Fla. 2007).  "A breach of the implied covenant of good faith and fair dealing is not an independent cause of action, but attaches to the performance of a specific contractual obligation."  *Centurion Air Cargo v. UPS Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005).  Moreover, "the implied obligation of good faith cannot be used to vary the terms of an express contract."  *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1316 (11th Cir. 1999) (quoting *Riviera Beach v. John's Towing*, 691 So. 2d 519, 521 (Fla. 4th DCA 1997)).

An implied covenant claim must adequately allege defendant's "failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence; but rather by a **conscious and deliberate act**, which unfairly frustrates the agreed common purpose and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement."  *Mount Sinai Med. Ctr. of Greater Miami, Inc. v. Heidrick & Struggles, Inc.*, 329 F. Supp. 2d 1309, 1313 (S.D. Fla. 2004) (citations omitted) (emphasis in original).

The implied covenant "is usually an issue when the question is not resolved by terms of the contract or when one party may make a discretionary decision without defined standards." *Townhouses*, 504 F. Supp. at 1310.  In other words, it is a "gap-filling default rule" "designed to protect the contracting parties' reasonable expectations." *Speedway SuperAm., LLC v. Tropic Enters.*, 966 So. 2d 1, 3 (Fla. 2d DCA 2007) (citations omitted).  When one party has "substantial discretion to promote that party's self interest, the duty to act in good faith nevertheless limits that party's ability to capriciously contravene the reasonable contractual expectations of the other party." *Id.* (quoting *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097 (Fla. 1st DCA 1999)).

Starting with Count 2, Popeyes argues it should be dismissed as duplicative of Count 1.  A claim for breach of the implied covenant "cannot be advanced when the allegations underlying that claim are duplicative of the allegations supporting the breach of contract claim." *Noble Capital Markets, Inc. v. Humanigen Inc.*, No. 20-cv-81131, 2021 U.S. Dist. LEXIS 261819, at *11 (S.D. Fla. Jan. 19, 2021).  "Florida law is clear—where a claim for breach of the covenant of good faith and fair dealing is indistinguishable from a claim for breach of contract, the claim for breach of the covenant of good faith and fair dealing is impermissibly duplicative and properly dismissed." *Alhassid v. Bank of Am., N.A.*, No. 14-cv-20484, 2015 U.S. Dist. LEXIS 188180, at *23 (S.D. Fla. Nov. 4, 2015).  Here, the claim for breach of the implied covenant based on the failure to properly consider proposed site packages (Count 2) sets forth substantively identical allegations as the claim for breach of contract (Count 1).  (*Compare* SAC ¶¶ 94–102, *with id.* ¶¶ 103–111).  Accordingly, the Court dismisses Count 2 as redundant of Count 1, but will grant Plaintiff leave to replead this claim, taking care not to duplicate the allegations supporting the breach of contract claim.  *See Saxon Fin. Group, Inc. v. Rath*, No. 11-cv-80646, 2012 U.S. Dist. LEXIS 111818, at *23 (S.D. Fla. Aug. 8, 2012) (dismissing claim for breach of implied covenant

of good faith and fair dealing because it "duplicates the allegations supporting the breach of contract claim," making it "impossible for the Court to distinguish between these two claims").

Popeyes contends that leave to amend Count 2 should be denied because any amendment would be futile. (PMTD at 18–19). The Court does not agree. Plaintiff alleges that Popeyes breached the implied covenant of good faith and fair dealing by failing to consider Plaintiff's proposed site packages under the same criteria Popeyes use to evaluate other sites in comparable markets. (SAC ¶¶ 103–11). This claim attaches to the performance of Sections 1.01 and 4.01 of the Development Agreement. (*Id.* ¶ 107). Section 1.01 grants Plaintiff "development rights to obtain franchises to establish and operate new Franchised Units," as long as Plaintiff is not in default. (D.A. § 1.01). Section 4.01 requires Popeyes to evaluate each proposed site package, again, as long as Plaintiff is not in default. (D.A. § 4.01). Section 4.01 further provides that Popeyes "may refuse to accept a site for a proposed Franchised Unit ***for any reason, in the Franchisor's sole judgment applying standards consistent with criteria Franchisor uses to approve sites in other comparable market areas*** . . . ." (D.A. § 4.01) (emphasis added).

Section 4.01 of the Development Agreement grants Popeyes significant discretion to define the "criteria" it implements to approve sites in comparable market areas. Indeed, the Complaint contains allegations regarding how the "criteria" Popeyes used to evaluate Plaintiff's proposed sites seemed to change as the parties' business relationship developed. (*See* SAC ¶ 88). In curing the pleading deficiencies identified by the Court, Plaintiff may be able to sufficiently state a claim that Popeyes breached the implied covenant of good faith with respect to Section 4.01 of the Development Agreement and thwarted Plaintiff's contractual expectations. *See Martorella v. Deutsche Bank Nat'l Tr. Co.*, 931 F. Supp. 2d 1218, 1226 (S.D. Fla. 2013).

Next, with respect to Count 3, Plaintiff alleges that Popeyes breached the implied duty of good faith and fair dealing by terminating the Exclusivity Provision of the Development

Agreement for pretextual reasons. (SAC ¶ 115). The alleged pretext was Plaintiff's purported failure to maintain its OPS Score within the top 50% of its Peer Category. (*Id.*). At the same time, Plaintiff contends that even if its ranking was less than the top 50% of its Peer Category, this failure was caused by circumstances outside of Plaintiff's control, including the poor condition of the Fresno Restaurants and POS system failures. (*Id.*). Plaintiff argues that this claim should be dismissed because Plaintiff failed to identify a provision of the Development Agreement that Popeyes breached. (PMTD at 9). Popeyes is correct that Section 1.02 the Development Agreement does not prohibit Popeyes from terminating the Exclusivity Provision; rather, it prohibits Popeyes from allowing anyone else to establish a Franchised Unit in the Development Area during the Development Term. (*Id.* at 15–16; Reply to PMTD at 9). And Plaintiff concedes that it has not alleged that Popeyes authorized someone else to establish a Franchised Unit in the Development Area during the Development Term. (*See* Resp. to PMTD at 14). Accordingly, Count 3 is dismissed without prejudice.

In its Response to Popeyes' Motion to Dismiss, Plaintiff clarifies that the actual contractual provision at issue in Count 3 is Section 5.03(E)(3) of the Development Agreement. (Resp. to PMTD at 14–15). Section 5.03(E)(3) permitted Popeyes to terminate the Exclusivity Provision upon default. (*See* D.A. § 5.03(E)(3)). Popeyes terminated the Exclusivity Provision based on Plaintiff's default under Section 5.03(B) of the Development Agreement. (*See* ECF No. 79-2 at 6). Section 5.03(B) provides that Plaintiff is in default if "taking into consideration operations at all Popeyes restaurants owned and operated by Developer or any affiliate or subsidiary of Developer . . . such operations fail at any time to score in the top fifty percent (50%) of the Peer Category . . . in which Franchisor places Developer for each of Franchisor's then-standard metrics as applied consistently across the Popeyes brand domestically." (D.A. § 5.03(B)). The Development Agreement defined "Peer Category" as "each category of similarly situated Popeyes

18

franchisees that Franchisor may designate from time to time in its discretion." (D.A. § 5.03(B)(1)). In sum, Popeyes could terminate that Exclusivity Provision if Plaintiff's operations did not obtain an OSAT Score that reached a certain ranking within Popeyes' discretionarily-defined Peer Category.

But Plaintiff does not allege that Popeyes failed to observe the reasonable limits of its discretion when setting the Peer Categories. Rather, Plaintiff alleges that it was unable to meet the rankings in its Peer Category through no fault of its own. No gap filling is required. Therefore, even if Plaintiff alleged the relevant contractual provisions, Plaintiff would not have stated a claim because there are no allegations that Popeyes capriciously exercised its discretion when it established the Peer Categories.

### iii.     FDUTPA (Count 4)

Plaintiff alleges that Popeyes violated FDUTPA by engaging in deceptive and unfair trade practices by trying to force Plaintiff to give up its development rights under the Development Agreement. (SAC ¶ 122). Popeyes' alleged deceptive and unfair trade practices included (1) manipulation of performance metrics to make it appear Plaintiff was in default when it was not; (2) refusing to consider site packages based on the inapplicable Expansion Policy; (3) failing to inspect the Fresno Restaurants before Plaintiff acquired them and using the poor condition of the Restaurants as a pretext to terminate the Exclusivity Provision and to refuse to review site packages; (4) using low OSAT Scores as a pretext for terminating the Exclusivity Provision. (SAC ¶ 123). Popeyes moves to dismiss this claim, arguing that Plaintiff has failed to allege actual damages, and because Plaintiff's claim is nothing more than a breach of contract claim. (PMTD at 7–11).

FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" § 501.204(1),

Fla. Stat. "To state a claim under FDUTPA, a party must allege (1) a deceptive act or unfair prejudice; (2) causation; and (3) actual damages." *Intercoastal Realty, Inc. v. Tracy*, 706 F. Supp. 1325, 1333 (S.D. Fla. 2010) (citing *Galstaldi v. Sunvest Comms. USA, LLC*, 637 F. Supp. 2d 1045, 1056 (S.D. Fla. 2009)).

A deceptive act or practice is "one that is likely to mislead consumers." *State Farm Mut. Ins. Co. v. Performance Orthopedics & Neurosurgery, LLC*, 315 F. Supp. 3d 1291, 1300 (S.D. Fla. 2018). An unfair practice is "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Id*. Following the 2001 amendment of the FDUTPA statute, "Florida's district courts of appeal have held that non-consumers may bring FDUTPA claims for damages under Fla. Stat. § 501.211(2)." *CMR Constr. & Roofing, LLC v. UCMS, LLC*, No. 21-11183, 2022 U.S. App. LEXIS 21039, at *9 (11th Cir. July 22, 2022). Notably, however, "in order to satisfy the first element for a claim for damages and injunctive relief under FDUTPA—i.e., a deceptive act or unfair practice—the plaintiff must allege that the relevant act or practice was harmful to a consumer." *Id.* (citing *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164, 167 (Fla 4th DCA 2015) ("[W]hile the claimant would have to prove that *there was an injury or detriment to consumers* in order to satisfy all of the elements of a FDUTPA claim, the claimant *does not have to be a consumer* to bring the claim." (emphasis in original))).

To establish causation, a plaintiff must show "how an allegedly deceptive or unfair practice actually resulted in damage." *Rossi v. Darden*, No. 16-cv-21199, 2017 U.S. Dist. LEXIS 6914, at *18 (S.D. Fla. Jan. 17, 2017). Reliance is not required, but "causation must be direct, rather than remote or speculative." *Id.* (citations omitted). With respect to damage, a plaintiff must "show actual damages which 'directly flow' from the deceptive or unfair act; consequential damages are not recoverable." *Id.*

While "an action giving rise to a breach of contract . . . may also constitute an unfair or deceptive act," *PNR, Inc. v. Beacon Prop. Mgmt.*, 842 So. 2d 773, 777 (2003), a "mere intentional breach of contract or interference with that contract" does not constitute a violation of FDUTPA, *Burger King Corp. v. Darryl D. Berry*, No. 20-cv-21801, 2020 U.S. Dist. LEXIS 256918, at *28 (S.D. Fla. Sept. 4, 2020) (citation omitted). "Florida law permits a FDUTPA claim to travel with a related breach of contract claim if the FDUTPA claim challenges the acts underlying or 'giving rise' to the breach, and does not 'rely solely on a violation of the Agreement as a basis for assertion of a FDUTPA claim." *Kenneth F. Hackett & Assocs. v. GE Capital Info. Tech. Solutions, Inc.*, 744 F. Supp. 2d 1305, 1313 (S.D. Fla. 2010).

Constructing the non-conclusory allegations in the light most favorable to Plaintiff, the Court finds that Plaintiff fails to state a FDUTPA claim. There are insufficient allegations concerning the alleged agreement to inspect the Fresno Restaurants to support a claim that Popeyes acted unfairly or deceptively with respect to any such agreement. Moreover, Plaintiff does not explain how this agreement is not entirely subsumed in the Asset Purchase Agreement, which is not at issue in this claim.

The remaining allegations pertaining to Plaintiff's FDUTPA claim vary from assertions that Plaintiff was not in default under the Development Agreement, that any default was a pretext for Popeyes' wrongful termination of the Exclusivity Provision, and that any default was caused by Popeyes' wrongful conduct. These allegations of wrongdoing do not exceed the terms of the Development Agreement. *See Epoch Int'l Partners, LLC v. Bigfoot Inc.*, 587 F. Supp. 1214, 1219 (S.D. Fla. 2022) (granting motion to dismiss FDUTPA claim because there were "no allegations of statements made or actions taken by Defendants that pertain to anything outside the terms of the parties' contract"). Tellingly, Plaintiff "is unable to articulate how [Popeyes'] conduct constituted an unfair or deceptive trade practice act without reference to the [Development]

Agreement." *See Ultimate Motors, Inc. v. Lionheart Motorcars, LLC*, No. 19-cv-60917, 2019 U.S. Dist. LEXIS 123511, at *5 (S.D. Fla. July 23, 2019).   The allegations amount to, at most, an intentional breach of the Development Agreement, which is not enough to state a FDUTPA violation. *See Evolution Logistics Corp. v. Efl Global LLC*, No. 21-cv-21042, 2021 U.S. Dist. LEXIS 256175, at *9 (S.D. Fla. May 20, 2021).   Count 4 is dismissed without prejudice.[4]

### iv.    **Mandatory Injunction Relief**

In its request for relief, Plaintiff seeks specific performance of the Development Agreement.   Florida law is clear that specific performance is not an available remedy where a contract for personal services is involved. *See Burger King Corp. v. Agad*, 911 F. Supp. 1499, 1506 (S.D. Fla. 1995); *Burger Chef Systems, Inc. v. Burger Chef of Fla., Inc.*, No. 317 So. 2d 795, 787-98 (Fla. 4th DCA 1975).   Here, The Development Agreement granted Plaintiff the "right to develop Popeyes Restaurants."   (D.A. at 1).   The "rights and duties set forth in the Agreement [were] personal to Developer, and . . . granted . . . in reliance on Developer's business skill and financial capacity."   (D.A. § 6.02).   Accordingly, Plaintiff was bound by the Development Agreement to perform certain personal services to Popeyes, namely, "the exclusive right to develop and operate ten new POPEYES® restaurants in the designated territory."   (SAC ¶ 4).   The Development Agreement, therefore, is a contract for personal services that is not subject to a suit for specific performance.   Plaintiff is not entitled to this form of relief and, if it chooses to amend, shall remove this request for specific performance.

---

[4]      The Second Amended Complaint does not appear to allege that a consumer was injured as a result of Popeyes' conduct. *See CMR Constr.*, 2022 U.S. App. LEXIS 21039, at *9, *12 ("Because [plaintiff] alleged harm solely to it-self—in its capacity as the construction service provider, and not to the consumer of its services—[plaintiff] failed to allege a harm to a consumer.").   Because Popeyes does not raise this issue in its Motion to Dismiss, the Court will not address it.

II.     **PLAINTIFF'S MOTION FOR LEAVE TO AMEND**

After Popeyes filed its Motion to Dismiss, Plaintiff moved to amend.  (MTA, ECF No. 103).  Popeyes has responded in opposition to the Motion to Amend, and Plaintiff has filed a reply in support of the Motion to Amend.  (Resp. to MTA, ECF No. 104; Reply to MTA, ECF No. 105). After careful consideration, the Court **GRANTS IN PART AND DENIES IN PART** the Motion to Amend.

1.     **Procedural Background**

In December 2020, Plaintiff filed suit in California state court against Popeyes and Defendants Does 1 through 10.  (ECF No. 1-1).  Popeyes timely removed the case to the Central District Court of California.  (ECF No. 1).  The Central District Court of California transferred the case to this Court based on the mandatory forum-selection clause contained in the Development Agreement, which required any dispute between the Developer and Franchisor be brought in the district in which the Franchisor had its principal place of business, which in this case was Miami, Florida.  (ECF No. 18 & 19).  In May 2021, after the case was transferred to this Court, Popeyes filed an answer to the complaint that included several affirmative defenses, one of which asserted that "Plaintiff's claims are barred by the express terms, conditions, limitations and exclusions contained in the parties' Development Agreement."  (ECF No. 30 at 9).

In December 2021, this Court entered its Order Setting Civil Trial Date and Pretrial Schedule, Requiring Mediation, and Referring Certain Motions to Magistrate Judge ("Scheduling Order").  (ECF No. 31).  The deadline to amend the complaint, as set forth in the Scheduling Order, was March 28, 2022.  (*Id.* at 5).  On March 23, 2022, Plaintiff moved for an extension of the deadline to file an amended complaint so that it could "amend its complaint . . . to conform with Florida law and statutes and the Federal Rules of Civil Procedure."  (ECF No. 54 at 2).  The Court granted Plaintiff's motion to extend the deadline to amend the complaint until April 1, 2022, stating

"[a]bsent exigent circumstances, this deadline will not be extended again." (ECF No. 55). Plaintiff moved within the April 1st deadline to amend its complaint, which the Court granted. (ECF Nos. 56 & 58). Plaintiff then filed its Amended Complaint. (ECF No. 63).

On April 22, 2022, Plaintiff moved for leave to file a second amended complaint. (ECF No. 76). This time, Plaintiff moved to amend to add "the identities and citizenship of Pinnacle's members." (*Id.* at 3). The Court granted Plaintiff leave to file a second amended complaint, even though the motion was filed past the already-extended April 1st deadline. (ECF No. 77). Plaintiff then filed the operative six-count Second Amended Complaint against Popeyes, RBI, and John Does 1 through 10.

On June 23, 2022—about two months after its last motion to amend, and a year and a half after the case was removed to this Court—Plaintiff filed the instant Motion to Amend, which requests leave to file a third amended complaint. (MTA at 2). The Motion to Amend seeks to amend to "add facts that have developed since the original complaint was filed," "address Popeyes' argument that Pinnacle's Second Amended Complaint is a shotgun pleading," and "add[] a claim for declaratory relief concerning the unenforceable exculpatory provision in the Development Agreement[.]" (*Id.* at 2–3).

Popeyes opposes Plaintiff's request to amend for a third time, arguing that Plaintiff has not demonstrated diligence warranting a deviation from the Court's twice-extended deadline to amend. (Resp. to MTA at 5). Popeyes takes specific issue with Plaintiff's request to add a declaratory-judgment claim. The proposed declaratory-judgment claim seeks a declaration from the Court that the Limitation of Liability Provision in the Development Agreement "is enforceable to preclude Pinnacle from recovering damages in the form of lost profits that it suffered as a result of Popeyes' breaches of the Development Agreement[.]" (ECF No. 103-1).

Popeyes argues that Plaintiff was aware of Popeyes' intent to enforce the Limitation of Liability Provision since at least May 2021, when Popeyes asserted as an affirmative defense that Plaintiff's claims are barred by the "the express terms, conditions, limitations and exclusions contained within the parties' Development Agreement." (ECF No. 30 at 9). In addition, Popeyes points out that Plaintiff served an interrogatory on Popeyes asking for the basis of this affirmative defense. (*See* ECF No. 104-1 at 1). In March 2022, Popeyes responded to the interrogatory by citing to and quoting from the Limitation of Liability Provision. (*Id.* at 4; *see also* ECF No. 103-2 at 25).

In its reply in support of the Motion to Amend, Plaintiff focuses on the new allegations it seeks to add to the proposed third amended complaint. (Reply to MTA at 1–4). Plaintiff contends that only in June 2022 did it learn that Popeyes would have allowed Plaintiff to continue developing and operating Popeyes Restaurants pursuant to the Development Agreement if the instant litigation was not pending. (ECF No. 103-24 ¶ 12). Plaintiff claims that these new allegations show that Popeyes' statements in June 2022 contradict Popeyes' arguments in its Motion to Dismiss that Popeyes cannot be compelled to continue working with Plaintiff. (*See* PMTD at 18).

### 2. <u>Legal Standard</u>

Federal Rules of Civil Procedure 15 and 16 govern Plaintiff's Motion to Amend. Rule 15(a)(2) provides that the Court should freely grant leave to amend a pleading "when justice so requires." Rule 15(a) "gives a district court 'extensive discretion' to decide whether or not to allow a party to amend a [pleading]." *Campbell v. Emory Clinic*, 166 F.3d 1157, 1162 (11th Cir. 1999) (citation omitted).

But when a party seeks to amend past the deadline set by the Court to do so, Rule 16(b) comes into play. Under Rule 16(b) provides that the "district judge . . . must issue a scheduling

order," that "limit[s] the time to . . . amend pleadings."  Fed. R. Civ. P. 16(b)(1), 3(a).  "[W]here a party's motion to amend is filed after the deadline for such motions, as delineated in the court's scheduling order, the party must show good cause why leave to amend the complaint should be granted."  *Smith v. Sch. Bd.*, 487 F.3d 1361, 1366 (11th Cir. 2007).  Good cause precludes the Court from modifying its scheduling order "unless the schedule cannot 'be met despite the diligence of the party seeking the extension.'"  *Sosa v. Airprint Sys.*, 133 F.3d 1417, 1418 (11th Cir. 1998).

The Court does not abuse its discretion by denying leave to amend "when the amendment would prejudice the defendant, follow undue delays, or is futile."  *Id.*  "Leave to amend a complaint is futile when the complaint as amended would still be properly dismissed or be immediately subject to summary judgment for the defendant."  *Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 200); *see Excheverria v. Bank of Am., N.A.*, 634 F. App'x 1006, 1009 (11th Cir. 2015) (concluding that district court did not err in denying leave to amend because proposed amended claims would not survive a motion to dismiss).  Moreover, the Court "may find undue delay when the movant knew of facts supporting the new claim long before the movant requested leave to amend, and amendment would further delay the proceedings."  *Tampa Bay Water v. HDR Eng'g, Inc.*, 731 F.3d 1171, 1186 (11th Cir. 2013).

### 3.  <u>Discussion</u>

First, Plaintiff's proposed new allegations concerning its request for specific performance are futile.  As explained earlier, the Development Agreement is a personal services contract, a breach of which cannot be remedied through specific performance.  Because any amendment seeking to supplement Plaintiff's request for specific performance would be futile, amendment is denied.  *See Cockrell*, 510 F.3d at 1310.

Second, as to Plaintiff's proposed declaratory-judgment claim and corresponding allegations, Plaintiff did not act diligently to assert this claim. This case arises out of the terms and conditions of the Development Agreement. The Development Agreement contains the Limitation of Liability Provision that appears to waive Plaintiff's right to recover any damages from Popeyes except for actual damages. (*See* ECF No. 103-2 at 25). When Plaintiff filed this suit, seeking to recover more than actual damages, it should have known that the Limitation of Liability Provision would be raised. But, at the very latest, Plaintiff knew Popeyes was relying on the Limitation of Liability Provision by March 2022—about a month before the Court's extended deadline for amendment. Plaintiff has not adequately explained its delay in asserting this proposed claim. Instead, it points to discovery disputes that do not contradict the fact that Plaintiff knew that Popeyes would be relying on the Limitation of Liability Provision well before the deadline to amend passed. Plaintiff's lack of diligence defeats Plaintiff's request to add the declaratory judgment claim. *See Donley v. City of Morrow*, 601 F. App'x 805, 811 (11th Cir. 2015) ("Lack of diligence in pursuing a claim is sufficient to show lack of good cause.").

Third, Plaintiff moves to amend to cure the Second Amendment Complaint from being a shotgun pleading. (MTA at 2). As currently pled, each of Plaintiff's claims adopts the allegations of all preceding counts. (*See* SAC ¶¶ 94–145). Doing so clearly violates Federal Rule of Civil Procedure 8. *See Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1322–23 (11th Cir. 2015) (noting that the most common type of shotgun pleading is "a complaint containing multiple counts where each count adopts the allegations of all preceding counts"). Plaintiff will be granted leave to amend to fix this pleading error.

## III.   RBI'S MOTION TO QUASH SERVICE OR, IN THE ALTERNATIVE, MOTION TO DISMISS

RBI has moved to quash service of process or, in the alternative, to dismiss the Second Amended Complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure

12(b)(2).   (RMTD, ECF No. 88).   Plaintiff has responded in opposition to RBI's Motion to Dismiss, and RBI has replied in support of its Motion to Dismiss.   (Resp. to RMTD, ECF No. 91; Reply to RMTD, ECF No. 101).   After careful consideration, the Court **GRANTS IN PART AND DENIES IN PART** RBI's Motion to Dismiss.

      1.   <u>**RBI's Motion to Quash**</u>

      RBI is a Canadian corporation with its principal place of business in Toronto, Canada. (SAC ¶ 11; May 6, 2022, Decl. of Jon Domanko ("Decl. Domanko") ¶ 3, ECF No. 88-1).   Federal Rule of Civil Procedure 4(h) applies to service of process on foreign corporation.   *See* Fed. R. Civ. P. 4(h).   Under Rule 4(h), service can be completed "in the manner prescribed by Rule 4(e)(1) for serving an individual."   Fed. R. Civ. P. 4(h).   In turn, Rule 4(e)(1) provides that service can be completed over an individual "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district is located."   Fed. R. Civ. P. 4 (e)(1). Therefore, Florida law applies because this Court is located in Florida.

      "Service of process is a jurisdictional requirement: a court lacks jurisdiction over the person of a defendant when that defendant has not been served."   *Pardazi v. Cullman Med. Ctr.*, 896 F.2d 1313, 1317 (11th Cir.1990).   When service of process is challenged, the party effecting service of process has the burden of establishing its validity.   *Reeves v. Wilbanks,* 542 F. App'x 742, 746 (11th Cir. 2013).   "In analyzing whether service is proper, the return of service is the point of departure."   *Bennett v. Christiana Bank & Tr. Co.*, 50 So. 3d 43, 45 (Fla. 3d DCA 2010).   "If the return of service is regular on its face, then the service of process is presumed to be valid."   *Morales L. Grp., P.A. v. Rodman*, 305 So. 3d 759, 761 (Fla. 3d DCA 2020) (adopting alteration) (quoting *Re-Employment Servs., Ltd. v. Nat'l Loan Acqs. Co.*, 969 So. 2d 467, 471 (Fla. 5th DCA 2007)). "'Regular on its face' means the return of service attests to all the information required by the service statute."   *Friedman v. Schiano*, 777 F. App'x 324, 331 (11th Cir. 2019).   Under Florida

law, the return of service shall note "(1) the date and time that the pleading comes to hand or is received by the process server, (2) the date and time that process is served, (3) the manner of service, and (4) the name of the person served and, if the person is served in a representative capacity, the position occupied by the person." *Koster v. Sullivan*, 160 So. 3d 385, 389 (Fla. 2015) (citing § 48.21(1), Fla. Stat.)

Under Florida law, there is a hierarchy for serving process on a foreign corporation. *See* § 48.081, Fla. Stat.  Under section 48.081,

> (1) Process against any private corporation, domestic or foreign, may be served:
>
>> (a) On the president or vice president, or other head of the corporation;
>>
>> (b) In the absence of any person described in paragraph (a), on the cashier, treasurer, secretary, or general manager;
>>
>> (c) In the absence of any person described in paragraph (a) or paragraph (b), on any director; or
>>
>> (d) In the absence of any person described in paragraph (a), paragraph (b), or paragraph (c), on any officer or business agent residing in the state.
>
> (2) If a foreign corporation has none of the foregoing officers or agents in this state, service may be made on any agent transacting business for it in this state.

§ 48.081(1)–(2), Fla. Stat.  "To bind a corporation for jurisdictional purposes, a return of service must show the absence of all officers of a superior class designated in the statute before resort is had to service upon an officer or agent of an inferior class." *Morgan Stanley Smith Barney, LLC v. Gib. Private Bank & Trust Co.*, 162 So. 3d 1058, 1060 (Fla. 3d DCA 2015).  "The object of section 48.081 is to have service made upon someone who is held responsible by the corporation, 'and it contemplates that service shall be made, whenever possible, upon the more responsible officers before resorting to service upon one of the inferior officers or agents of the corporation.'" *Bank of Am., N.A. v. Bornstein*, 39 So. 3d 500, 503 (Fla. 4th DCA 2010) (citation omitted).

On April 16, 2022, Plaintiff attempted to serve RBI's Chief Executive Officer ("CEO"), Chief People & Services Officer ("CPSO"), and Chief Financial Officer ("CFO"), at their homes in Florida.  (*See* ECF Nos. 91-9, 91-10, 91-11).   Service was unsuccessful on RBI's CEO and CPSO.  (*See* Aff. of Due Diligence, ECF No. 91-9; *see also* ECF No. 91-12 at 2; Aff. of Due Diligence, ECF No. 91-10; *see also* ECF No. 91-14 at 2).   The parties do not dispute, however, that Plaintiff served a copy of the summons and complaint on Matthew Dunnigan, who is RBI's CFO.  (Proof of Service at 2; ECF No. 91-11).  The return of service did not state Plaintiff's attempts to serve the CEO or CPSO.  (*See id.*).

In moving to quash service, RBI contends that service was not perfected over it because Dunnigan is not a "head of the corporation."  (Reply to RMTD at 3).  RBI states that Jose Cil—RBI's Chief Executive Officer—is the head of RBI.  (*Id.*).  As CFO, Dunnigan manages the financial affairs and reporting aspects of RBI.  (Reply to RMTD at 3, ECF No. 101; *see also* June 10, 2022, Declaration of Matthew Dunnigan ("Decl. Dunnigan") ¶ 4, ECF No. 101-2).

In opposition, Plaintiff contends that Dunnigan is a "head of the corporation" by virtue of his role as CFO and because he is listed as one of "RBI['s] Corporate Leaders" on RBI's public website.  (Resp. to RMTD at 5–6; *see also* ECF No. 91-8 at 2).  Dunnigan previously served as the treasurer of RBI from October 2014 until January 2018.  (May 20, 2022, Declaration of Filemon Carrillo ("Decl. Carrillo") ¶ 10, ECF No. 91-1).

Neither party explains how Florida courts define a "head of the corporation," and there appears to be very little guidance in the law on who qualifies as a "head of the corporation." Regardless of whether service was not perfected or not, the Court must dismiss RBI because Plaintiff did not establish that RBI was engaged in business in the state and that the claims against RBI arise from those business activities.  *See Caribe & Pan. Invest. v. Christensen*, 375 So. 2d 601, 603 (Fla. 3d DCA 1979) ("[A]ttempted service upon a non-resident foreign corporation

pursuant to Section 48.081(1) by personally serving an officer of that corporation while he was in Florida was insufficient to give the Florida courts in personam jurisdiction where there was no showing that the corporation had been doing business in Florida or that the cause of action arose from the corporation's activities in this state."). As explained below, the Court lacks personal jurisdiction over RBI.

### 2. **RBI's Motion to Dismiss**

To exercise personal jurisdiction over a non-resident defendant like RBI, the plaintiff must (1) satisfy Florida's long-arm statute, and (2) demonstrate that defendant has sufficient minimum contacts with Florida to meet constitutional due process requirements. *See Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990). Both jurisdictional inquiries must be satisfied. *Id.* Florida's long arm-statute must be strictly construed and interpreted according to Florida law. *Sierra Equity*, 650 F. Supp. at 1222. Because the Court finds that Plaintiff does not satisfy Florida's long-arm statute, it does not reach due process.

### i.   **Legal Standard**

On a motion to dismiss, the Court must "accept the facts alleged in plaintiff's complaint as true, to the extent that they are not contradicted by defendant's affidavits." *Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC*, 650 F. Supp. 1213, 1221 (S.D. Fla. 2009). If plaintiff "pleads sufficient materials facts to form a basis for personal jurisdiction, the burden shifts to the defendant to challenge the plaintiff's allegations by affidavits or other pleadings." *Id.* at 1222. When the nonresident defendant submits such evidence, the burden shifts back to plaintiff to "substantiate the jurisdictional allegations in its complaint by affidavits or other competent proof, and may not merely rely upon the factual allegations set forth in the complaint." *Id.*; *see also Abramson v. Walt Disney Co.*, 132 F. App'x 273, 276 (11th Cir. 2005) ("After a plaintiff has established a prima facie case for jurisdiction and the defendant has filed affidavits contesting

31

jurisdiction, the plaintiff bears the burden of proving sufficient jurisdiction by affidavits or other sworn statements.").

**ii.**   **Discussion**

**A. Specific Personal Jurisdiction**

Plaintiff argues that the Court has specific personal jurisdiction over RBI for "operating, conducting, engaging in, or carrying on a business" in Florida.  (Resp. to RMTD at 8 (citing § 48.193(1)(a)1, Fla. Stat.)).  Specifically, Plaintiff contends that the Court has personal jurisdiction over RBI because Popeyes—RBI's subsidiary—has its principal place of business in Florida and conducts business in Florida.  (*Id.* at 9).  Moreover, Plaintiff alleges that RBI develops Popeyes' marketing strategy and Popeyes acts at RBI's direction.  (*Id.* at 9–10 (citing SAC ¶¶ 48, 62)).  Relatedly, Plaintiff alleges that Popeyes complied with RBI's orders to terminate the Development Agreement.  (Resp. to RMTD at 9–10 (citing SAC ¶ 49)).

In addition, Plaintiff contends that RBI has its own office and operations in Florida.  (Decl. Carrillo ¶¶ 5–6).  RBI sufficiently rebutted these allegations by submitting evidence that any reference to "RBI" headquarters, offices, or operations in the United States refers to RBI US (a non-party), other RBI subsidiaries, or RBI-affiliated companies, not RBI itself.  (June 10, 2022, Decl. of Michele Keusch ¶¶ 3, 6, 9–11, ECF No. 101-1).

There are three avenues for exercising personal jurisdiction over a nonresident parent corporation based on the actions of a subsidiary under Florida law: (1) "the plaintiff may show that the non-Florida parent company independently satisfies the test for jurisdiction under Florida's long-arm statutes"; (2)  "the plaintiff may establish facts that justify piercing the corporate veil"; or (3) "the plaintiff may show that the parent exercises sufficient control over the subsidiary to render the subsidiary an agent or alter ego of the parent, thus establishing jurisdiction." *Knepfle v. J-Tech Corp.*, 48 F.4th 1282, 1292 (11th Cir. 2022) (alteration adopted) (quoting *Schwartzberg*

*v. Knobloch*, 98 So. 3d 173, 182 (Fla. 2d DCA 2012)).  With respect to the third avenue, "the amount of control exercised by the parent must be high and very significant." *Id.*

Plaintiff's factual allegations do not justify piercing the corporate veil or show that Popeyes is RBI's agent.  Plaintiff does not allege that Popeyes was a "mere instrumentality" that lacks "separate corporate interests of its own" and functions "solely to achieve the purpose of the dominant corporation." *Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1273 (11th Cir. 2002).  At most, Plaintiff shows that RBI and Popeyes had "regular and extensive contact" with one another, had a "very close working relationship," had overlapping officers, and that Popeyes had no "independent marking plan or strategic plan." *See Gen. Cigar Holdings, Inc. v. Altadis, S.A.*, 205 F. Supp. 2d 1335, 1344 (S.D. Fla.), *aff'd*, 54 F. App'x 492 (11th Cir. 2002).  This is not enough to impute the actions of Popeyes to RBI. *Id.*; *see also Sanchez v. Team Health, LLC*, No. 18-cv-21174, 2021 U.S. Dist. LEXIS 64213, *16–17 ("That the parent approves major policy decisions of the subsidiary and establishes the subsidiary's goals and directives is not sufficient to render the subsidiary merely a formality.").

Even if Popeyes' contacts in Florida could be attributed to RBI, those contacts do not establish personal jurisdiction over RBI in Florida because they do not arise from the claims asserted here. *See* § 48.193(1)(a), Fla. Stat.  The exercise of specific personal jurisdiction requires the cause of action "arise from" the defendant's conduct in Florida. *See Sun Tr. Bank v. Sun Int'l Hotels, Ltd.*, 184 F. Supp. 2d 1246, 1269–70 (S.D. Fla. 2001) (citing Florida law).  Indeed, "there must [] be some 'direct affiliation, nexus, or substantial connection between the cause of action and the activities with the state." *Id.*; *Bloom v. A. H. Pond Co.*, 519 F. Supp. 1162, 1168 (S.D. Fla. 1981) (noting that "doing business in this state is not a sufficient basis, standing alone, upon which to predicate long-arm jurisdiction" and that "[t]here must also be some nexus or connection between the business that is conducted in Florida and the cause of action alleged"); *Tancogne v.*

*Aquimpex, S.p.A.*, No. 07-22553-CIV-JORDAN, 2009 U.S. Dist. LEXIS 141139, at *10 (S.D. Fla. Mar. 6, 2009) (granting motion to dismiss where plaintiff failed to satisfy "connexity" requirement under Florida's long-arm statute).

Here, Plaintiff asserts three claims against RBI for (1) a violation of FDUTPA; (2) tortious interference with a contractual relationship; and (3) tortious interference with a business relationship. (SAC ¶¶ 121–45). None of these claims arise from Popeyes' conduct in Florida. The Development Agreement and the parties' business relationship concerns the development and operation of Popeyes Restaurants in California. Plaintiff is a California limited liability company. At bottom, there are insufficient allegations connecting Popeyes' contacts with Florida to the claims asserted here. For the same reasons, there are insufficient allegations connecting RBI, on its own, with the claims asserted here. Therefore, the Court lacks specific personal jurisdiction over RBI under Florida's long-arm statute.

### B. General Jurisdiction

Plaintiff also contends that the Court can exercise general jurisdiction over RBI for conducting "substantial and not isolated activity" within Florida. (Resp. to RMTD at 8 (citing § 48.193(2), Fla. Stat.)). The reach of general jurisdiction under Florida's long-arm statute "extends to the limits on personal jurisdiction imposed by the Due Process Clause of the Fourteenth Amendment." *Carmouche v. Tamborlee Mgmt.*, 789 F.3d 1201, 1204 (11th Cir. 2015). Accordingly, the general jurisdiction analysis under Florida's long-arm statute and due process are the same. *See id.; Ferenchak v. Zormati*, No. 21-cv-22401, 2021 U.S. Dist. LEXIS 220524, at *11 (S.D. Fla. Nov. 15, 2021). The Court can exercise general personal jurisdiction over nonresident defendant based on its (1) place of incorporation, or (2) principal place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). Absent the "paradigm all-purpose forums," the Court may only exercise general jurisdiction over a nonresident defendant in the "exceptional" case where a

"foreign corporation is 'at home' in a forum other than its place of incorporation or principal place of business." *Carmouche*, 789 F.3d at 1204.

There is no dispute that RBI is incorporated in Canada with its principal place of business in Canada.  (SAC ¶ 11; *see also* Resp. to RMTD at 3).  There are no exceptional circumstances warranting a finding of general jurisdiction over RBI in Florida.  Moreover, as noted earlier, the Court cannot exercise jurisdiction over RBI by way of Popeyes' contacts with Florida.  Therefore, the Court cannot exercise general jurisdiction over RBI under Florida's long-arm statute.

## IV.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** as follows:

1.     Popeyes' Motion to Dismiss, (ECF No. 80), is **GRANTED IN PART AND DENIED IN PART**.  Counts 2, 3, and 4 are **DISMISSED WITHOUT PREJUDICE** as to Popeyes only.  Plaintiff is granted leave to amend Count 2.  To the extent Plaintiff seeks to amend Counts 3 and 4, it shall file an appropriate motion for leave to amend those claims. [5]  Any motion for leave to amend and proposed third amended complaint shall not rehash any of Plaintiff's prior arguments and must carefully cure the deficiencies identified in this Order.  To that end, **on or before December 30, 2022**, Plaintiff shall either: (i) file a motion for leave to amend Counts 3 and 4, or (ii) file a third amended complaint in accordance with this Order.  If Plaintiff chooses to move to amend Counts 3 and 4, the Court will rule on any such motion before Plaintiff files a third amended complaint in accordance with this Order.  Popeyes' Motion to Dismiss is **DENIED** in all other respects.

---

[5]     Plaintiff requested leave to amend the Second Amended Complaint in response to the Motion to Dismiss.  But "[w]here a request for leave to file an amended complaint simply is imbedded within an opposition memorandum the issue has not been raised properly." *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1222 (11th Cir. 1999).

2.       Plaintiff's Motion to Amend, (ECF No. 103), is **GRANTED IN PART AND DENIED IN PART**.  Plaintiff is **GRANTED** leave to amend to cure its shotgun pleading.  The Motion to Amend is **DENIED** is all other respects.

3.       RBI's Motion to Dismiss, (ECF No. 88), is **GRANTED IN PART AND DENIED IN PART**.  RBI is **DISMISSED WITHOUT PREJUDICE** because the Court lacks personal jurisdiction over RBI under Florida's long-arm statute.  RBI's Motion to Dismiss is **DENIED** in all other respects.

**DONE AND ORDERED** in Chambers at Miami, Florida, 16th day of December, 2022.

_____
JOSÉ E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
All Counsel of Record
Magistrate Judge Becerra